WADE *v.* MURPHY.

4-5073

Opinion delivered May 30, 1938.

Tom Marlin, R. K. Mason and Carmichael & Hendricks, for appellants.

J. Bruce Streett, Hardy & Morrow and D. K. Hawthorne, for appellees.

GRIFFIN SMITH, C. J. Prior to June 13, 1933, T. C. Murphy and his wife, Ella Murphy, owned stock in National Savings & Loan Association of Little Rock of the par value of $12,000, with interest amounting to $500. Early in 1933, the Loan Association stood in default, and its affairs passed into liquidation.

Appellant H. G. Wade is an attorney of Camden and had been employed by appellees to look after business for them in connection with deposits in an insolvent bank; also to represent them in the matter of stock holdings in an El Dorado building and loan association, and otherwise. Specifically, he was employed to assist appellees in realizing upon their stock in National Savings & Loan Association.

Appellees testified that at Wade's suggestion they sold the $12,500 of stock and accrued interest to L. L. Overton. Negotiations were consummated in Wade's law office June 13, at which time Overton's two notes for $6,250 each, payable in six and twelve months, were delivered. Overton and wife also joined in a mortgage for appellees' benefit covering 229 acres of land.

Overton, before or shortly after the first note fell due, wrote Murphy that on account of sickness and unexpected expenses he would not be able to meet the obligation. Both notes were turned over to Wade, in response to a letter from the attorney saying he would foreclose. Instead of foreclosing, Wade secured a deed from Overton and wife, dated February 6, 1934, and forwarded it to the Murphys.

August 21, 1936, the Murphys filed suit against H. G. Wade, M. L. Wade, L. L. Overton and wife, and J. S. McCarley and wife, alleging, in effect, a conspiracy between Wade, Overton, and McCarley to defraud in connection with Overton's conduct in the manner of acquiring the building and loan stock. In the decree rendered November 8, 1937, the chancellor denied recovery from the Overtons and McCarleys, but gave judgment against H. G. Wade and Mrs. M. L. Wade for $6,250, subject to certain credits. From this decree and judgment they appealed. From the allowance of an attorney's fee in favor of H. G. Wade, and from failure of the court to give judgment for interest at 6 per cent. on $3,905 from October, 1933, appellees prosecuted a cross-appeal.

In addition to a denial of wrongdoing, appellees rely upon a "Receipt and Settlement" of March 20, 1935, executed by the Murphys and Wades, in which appellants

acknowledged receipt of $300 "in full settlement and compromise of all claims arising between the parties of every kind and character, including services rendered heretofore by H. G. Wade for T. C. Murphy and Ella Murphy in regard to closing a transaction with the Union Savings Building & Loan Association, the employment and services rendered in the matter of the Progressive Building & Loan Association in the chancery court of Union county, and all other matters of every kind and character between the parties hereto. It is agreed that H. G. Wade withdraw from further legal services. This agreement and the consideration hereinbefore named is a compromise and full settlement of all controversy between the above named parties and each of them, and the said H. G. Wade, growing out of his services as attorney or otherwise."

The chancellor found that Overton conveyed 229 acres of land to appellees; that the fair market value was $5 per acre, or $1,145; that the building and loan stock was worth 50 cents on the dollar, or $6,250; that the value of Wade's services as an attorney was $1,500, from which the sum of $300 paid should be deducted; that such net indebtedness was $3,905, and that this balance should draw interest at 6 per cent. from date of the decree.

The record sufficiently sustains the allegation that as between H. G. Wade and appellees the relationship of attorney and client existed. T. C. Murphy was nearly seventy years of age, and testified that in selling the stock, and in other business matters, he relied largely upon the judgment and advice of his attorney, with whom he had discussed the stock dilemma. Murphy testified that in 1933 he lived at Calion, in Union county; that after he had employed Wade to look after the stock a man named Grace came to his home and offered to trade 40 acres of improved land, worth $8,000, for the stock; that Wade came to Calion and told him he already had too much land, and advised against making the trade, saying: "We are not going to do any business today, but come to my office tomorrow." Murphy testified: "I

went to his office, and Wade said, 'I am not going to do that. You don't need any property; you have more now than you want.' I said, 'Yes, I have,' and we went on home. After a while a little man came to my house and asked if I didn't have some building and loan stock, and I said, 'Yes, but Mr. Wade has it.' The man was Overton. He said that Wade said for me to come up there. The next day the little man came back and said he would take me in his car. I told him we had a car; and we came [to Wade's office] the next day. The first thing we saw was a certificate, and Wade said, 'Mr. Murphy, you sign here; and Mrs. Murphy, you sign here,' and I said I wouldn't do it. My wife said, 'Have you the down payment here?' and Mr. Wade said 'No.' We went ahead and signed it. . . . He told me [the stock] wasn't worth ten cents.''

C. I. Grayson testified that he was interested in a bank at Camden; that the bank had a mortgage on all the land involved in this controversy except 40 acres, and that the bank foreclosed. A week or two after the foreclosure sale, at which Grayson personally purchased, Wade came to him and wanted to buy the property. Witness had contracted to sell 40 acres to a darkey, but offered to sell Wade the remainder. Wade asked that the deed be made to McCarley. It was dated April 28, 1932. The deed showed a consideration of $10, but the actual consideration was between $300 and $400. Grayson said: ''The market value of the land at that time was between $2.50 and $5 per acre. I sold the land for the amount I paid for it at the sale, less the 40 acres—all I gained was the price of the 40 acres. This waste land can be purchased at from $2.50 to $3 an acre.''

Although there was other testimony as to the value of the land, with estimates running to $15 per acre, the conclusion reached by the chancellor that $5 per acre would be a fair price is not contrary to the weight of evidence. It was shown that the land was within half a mile of oil production. Murphy testified that, at the time he sold to Overton, the latter stated he was going to drill a well if he got the stock certificates. Murphy

also stated that some one proposed leasing the land at $10 per acre, but nothing came of the offer.

Murphy testified he had no idea what the stock was worth, but that he came to Little Rock and conferred with J. M. Sadler, vice-president and secretary of National Savings & Loan Association. Sadler told him that the price in 1933 ranged from 25 to 30 cents—sometimes it would go as high as 35 cents. Other estimates ranged as low as 20 cents.

Immediately after acquiring the stock from appellees, Overton had it transferred to himself, and shortly thereafter it was reissued in the name of M. L. Wade. The complaint alleged that this transfer was made on or about October 19, 1933, and the witness Sadler testified that it was about that time.

December 24, 1934, the company paid a dividend of 25 per cent. In 1936 a dividend of 15 per cent. of the unpaid balance was paid, or 11.25 per cent., and a final payment of 58 per cent. of the unpaid balance, or 36.97% plus, was made. Altogether the stock paid 73.225. If appellees had retained their stock, the first dividend of 25 per cent. would have yielded them $3,125; the second dividend of 11.25 per cent. would have yielded $1,406.25, and the final dividend of 36.97 plus would have yielded $4,621.87, or a total of $9,149.12.

Result of the transaction with appellants was that for stock finally paying more than nine thousand dollars, appellees received 229 acres of land worth $1,145. The chancellor, in the decree, found that the actual value of the stock in June, 1933, was fifty per cent. of par, or ·$6,250. It is urged by appellants that there was no testimony to support this finding; that none of the witnesses mentioned such a figure. On the other hand, it is shown that Mrs. Wade disposed of the stock, and no satisfactory explanation of such disposition is given. Neither Overton nor Mrs. Wade was called by the defendants. Overton could have told of his sale—if indeed the transaction rose to the dignity of a sale—to Mrs. Wade; and she, in turn, could have given interesting testimony.

There are accusing circumstances, other than personal testimony, which protrude themselves into the record, and as to which no effort has been made by appellants to offer explanations: One is that at a time Wade was insisting the stock was not worth more than 20 cents on the dollar, he caused Overton to purchase at par and execute notes. Wade, according to the witness Grayson, was the equitable purchaser of all the land in question except 40 acres for between three and four hundred dollars; therefore he knew of its value, or lack of value. He caused the deed to be made to McCarley, and McCarley transferred to Overton. One of McCarley's deeds to Overton was executed June 12—only a day before Overton mortgaged to appellees.

Of these transactions the appellant H. G. Wade could not have been ignorant; and yet, acting in an advisory capacity to appellees, and serving as their attorney, he consummated a deal grossly disproportionate as to values. When Overton, who appears to have been insolvent, was called upon to pay, Wade urged that appellants accept a deed to the mortgaged land, thus relieving Overton, and incidentally establishing a record of clearance for himself. ·

The building and loan stock at the time of its transfer may have had a low market value. It is conceivable —the testimony even indicates—that not more than 25 cents on the dollar could have been immediately realized in cash, and it is inferable that appellees would have sold at that price if a cash offer had been made. But this does not justify the attorney-appellant in resorting to the stratagem of juggling titles and clothing the transaction with elements of deception. Nor was it consistent with good faith and ethical practice for the attorney to permit his wife at a later date to take an assignment of the stock, in the circumstances of the case, without advising with appellees.

It is our view that the chancellor was not only justified in placing the highest reasonable value on the stock, but that it became his imperative duty to do so, and the appraisement of $6,250 will not be disturbed.

454

We think, however, that the chancellor erred in the amount allowed as attorney's fee—$1,500. If the so-called "Receipt and Settlement" had any function whatever, it evidenced a compromise as to claims other than those connected with the questioned stock transaction. Wade agreed to accept $300 for such services, and was paid in full. Nothing more was due him, and the additional credit of $1,200 will be disallowed. The result is that the balance due by appellants is $5,105, for which judgment should have been given. This item should draw interest at 6 per cent. from October 19, 1933.

By certiorari certain matters not included in the original transcript were brought up, including motion to set aside the decree. We find nothing in the new matter to justify a retrial of the cause.

The decree is affirmed on appeal and reversed on cross-appeal, with directions that a decree be entered consistent with this opinion.